Appeal No. 21-4324

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

### UNITED STATES OF AMERICA,

Appellee,

v.

### TIBA CONLEY,

Appellant.

---

*Appeal from the United States District Court for the*
*District of Maryland, Southern Division*
*The Honorable Peter J. Messitte, Senior District Judge*

---

## BRIEF OF APPELLEE
## UNITED STATES OF AMERICA

---

**Erek L. Barron**
**United States Attorney**

**Joseph R. Baldwin**
**Assistant United States Attorney**

**6500 Cherrywood Lane, 4th Floor**
**Greenbelt, Maryland 20770**
**(301) 344-4433**

June 21, 2022                    *Attorneys for the Appellee*

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION ................................................................1

STATEMENT OF THE ISSUES ...................................................................1

STATEMENT OF FACTS ...........................................................................3

I.  SEARCH WARRANT ISSUED FOR CONLEY'S RESIDENCE. .....3

II.  EXECUTION OF RESIDENTIAL SEARCH WARRANT ................7

III.  ADDITIONAL EVIDENCE AT TRIAL CONNECTS CONLEY
TO THE RESIDENCE, THE GUNS, AND THE DRUGS. .................8

IV.  DISTRICT COURT DOES NOT PERMIT DEFENDANT'S
MOTHER TO TESTIFY ....................................................................9

V.  THE DISTRICT COURT TWICE INSTRUCTS CONLEY ON
HIS RIGHT TO TESTIFY. ...............................................................13

VI.  CONLEY LEAVES THE COURTROOM, BUT REQUESTS TO
TESTIFY FROM THE COURTHOUSE CELLBLOCK AND IS
DENIED. ...........................................................................................19

SUMMARY OF ARGUMENT ...................................................................22

ARGUMENT ...............................................................................................23

I.  THE SEARCH WARRANT FOR CONLEY'S RESIDENCE
WAS SUPPORTED BY PROBABLE CAUSE ...............................23

    A.  Standard of Review. ...............................................................23

    B.  The State Court Judge Had a Substantial Basis for Issuing
the Warrant to Search Conley's Residence. ...........................23

    C.  The Executing Officers Relied on the Warrant in
Good Faith. .............................................................................27

i

II.    THE DISTRICT COURT APPROPRIATELY EXERCISED
       DISCRETION IN NOT ALLOWING TESTIMONY FROM
       CONLEY'S MOTHER. ..................................................................29

       A.    Standard of Review...................................................29

       B.    Testimony of Conley's Mother was Properly Excluded...........30

III.   THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION
       AND DID NOT ERR IN REFUSING REMOTE TESTIMONY BY
       CONLEY AFTER CONLEY REFUSED TO BE IN THE
       COURTROOM. ...........................................................................34

       A.    Standard of Review...................................................34

       B.    Conley Waived His Right to Testify When He Declined to
             Be Present in the Courtroom.......................................34

       C.    There Was No Plain Error in the District Court's Decision
             Not to Allow Defendant to Testify Remotely from Lockup.. ..38

IV.    CONLEY'S COUNSEL PERFORMED IN AN OBJECTIVELY
       REASONABLE MANNER AND CONLEY WAS NOT
       PREJUDICED BY HIS COUNSEL'S PERFORMANCE. ................41

       A.    Standard of Review...................................................41

       B.    The Trial Record Does Not Support Conley's Claim of
             Ineffective Assistance of Counsel that is Built on a
             Counterfactual Hypothesis.........................................43

CONCLUSION.............................................................................46

STATEMENT WITH RESPECT TO ORAL ARGUMENT.......................47

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ii

# TABLE OF AUTHORITIES

## CASES

*Fields v. Atty. Gen'l of Md.*, 956 F.2d 1290 (4th Cir. 1992) ...................................43

*Illinois v. Gates*, 462 U.S. 213 (1983) ............................................................. 23, 24

*Maryland v. Craig,* 497 U.S. 83 (1990)....................................................................39

*McKaskle v. Wiggins*, 465 U.S. 168 (1984)..............................................................40

*Rock v. Arkansas*, 483 U.S. 44 (1987) .............................................................. 34,39

*Strickland v. Washington*, 466 U.S. 668 (1984) ............................................... 43, 45

*Taylor v. Illinois*, 484 U.S. 400 (1988)........................................................ 30, 31, 33

*United States v. Anderson*, 851 F.2d 727 (4th Cir. 1988)........................................25

*United States v. Beckton*, 740 F.3d 303 (4th Cir. 2014) ..........................................40

*United States v. Benton*, 523 F.3d 424 (4th Cir. 2008)...........................................42

*United States v. Blakeney*, 949 F.3d 851 (4th Cir. 2020) ........................................23

*United States v. Brown*, 757 F.3d 183 (4th Cir. 2014) ...........................................42

*United States v. Byrd*, 403 F.3d 1278 (11th Cir. 2005) .................................... 38, 39

*United States v. Camacho*, 955, F.2d 950 (4th Cir. 1992)............................... 34, 35

*United States v. Campbell*, 480 Fed. App'x. 610 (2d Cir. 2012) ...................... 38, 39

*United States v. Carthorne*, 878 F.3d 458 (4th Cir. 2017) ......................................43

*United States v. Catone*, 769 F.3d 866 (4th Cir. 2014) ...........................................39

*United States v. Freeman*, 24 F.4th 320 (4th Cir. 2022) ........................... 42, 43, 45

*United States v. Fulks*, 454 F.3d 410 (4th Cir. 2006) .............................................29

*United States v. Hyppolite*, 65 F.2d 1151 (4th Cir. 1995) ......................................28

*United States v. Jones*, 942 F.3d 634 (4th Cir. 2019) ....................................... 23-24

*United States v. King*, 119 F.3d 290 (4th Cir. 1997) ..............................................42

*United States v. Lalor*, 996 F.2d 1578 (4th Cir. 1993) ...................................... 25-27

*United States v. Leon*, 468 U.S. 897 (1984) .............................................. 27, 28, 29

*United States v. Muslim*, 944 F.3d 154 (4th Cir. 2019) ................................... 34, 37

*United States v. Olano*, 507 U.S. 725 (1993) ........................................................39

*United States v. Prince-Oyibe*, 320 F.3d 494 (4th Cir. 2003) ................................30

*United States v. Ramos-Gonzalez*, 775 F.3d 483 (1st Cir. 2015) ..........................31

*United States v. Rose*, 3 F.4th 722 (4th Cir. 2021) ................................................42

*United States v. Valenzuela-Bernal*, 458 U.S. 858 (1982) ....................................30

*United States v. Williams*, 548 F.3d 311 (4th Cir. 2008)................................. 27, 29

*United States v. Wilson*, 240 F. App'x 139 (7th Cir. 2007).......................................

## STATUTES

18 U.S.C. § 3231 .......................................................................................................1

Fed.R.Crim.P. 43(c)(1)(A) & (C) ...................................................................... 35, 37

v

## STATEMENT OF JURISDICTION

The district court (Peter J. Messitte, J.) had jurisdiction over this federal criminal case under 18 U.S.C. § 3231.   On September 25, 2020, after a five day trial, a jury convicted the defendant of possession with intent to distribute controlled substances (Count 1), possession of firearms in furtherance of a drug trafficking crime (Count 2), and felon in possession of firearms and ammunition (Count 3).   JA 19; SJA 1-4.   On June 15, 2021, Conley was sentenced to a total term of imprisonment of 157 months, including 97 months on Count 1 and 3 with 60 months consecutive on Count 2.   JA 845-46.

## STATEMENT OF THE ISSUES

I. Whether a search warrant that established Conley's activity in the drug trade for years, his possession of weapons, his sale of narcotics in two controlled-buys, surveillance confirming his use of the residence, and other factors, set forth sufficient facts to establish probable cause for a search of Conley's residence?

II. Whether the officers objectively relied in good faith on the search warrant?

III. Whether the district court properly exercised its discretion when, in light of the extraneous issues that would be raised by the proffered testimony and the narrowness of the issue before the jury, the district court denied a defense motion made during trial to add a previously undisclosed witness?

1

IV. Whether the district court properly denied Conley's motion to testify from the cell where he was being held in the courthouse after he refused to come to the courtroom, and after jury instructions had already begun?

V. Whether the defendant's attempt to raise ineffective assistance on direct appeal must be denied because the trial record does not conclusively establish that Conley's trial counsel was ineffective when Conley left the courtroom and only requested, after jury instructions had begun, that he testify remotely from lockup?

## STATEMENT OF FACTS

## I.    SEARCH WARRANT ISSUED FOR CONLEY'S RESIDENCE.

On September 14, 2016, Sergeant Grant of the Prince George's County Police Department applied for a warrant to search Conley's residence in Ellicott City, Howard County, Maryland.   JA 138.1.   The search warrant was approved by Judge Lisa L. Broten of the District Court of Maryland.

The Application listed three crimes that Sergeant Grant believed were implicated by Conley's conduct:

1.    Possession of CDS Not Marijuana in violation of CR 5-601(a)(1)

2.    Possession of Drug Paraphernalia in violation of CR 5-619

3.    CDS Possession with the Intent to Distribute, in violation of CR-5-602.

*Id*.   The Application, through attachment A, listed six categories of property to be seized:

1.    Books, cellular phones, records, receipts, notes, bank statements and other papers relating to the purchase, distribution and/or proceeds of controlled dangerous substances, in particular, crack cocaine, powder cocaine.

2.    United States currency indicative of the proceeds of illegal narcotics sales.

3.    Photographs, in particular, photographs of co-conspirators, of assets, and/or of controlled substances, in particular; heroin

4.    Indicia of occupancy, residency, and/or ownership of the premises described above, including, but not limited to, utility and telephone bills, canceled envelopes, and keys.

3

5.     Controlled dangerous substances and related paraphernalia including but not limited to packaging material, scales, and storage materials.

6.     Firearms and ammunition.

JA 138.2.

The application was supported by a six-page affidavit setting forth the affiant's experience; facts about drug distributors known to the affiant based on training, knowledge, and experience; and facts about Conley and the Riggs Park Crew to which he belonged.   JA 138.3-138.8.   The affidavit set forth the 17 years of experience of the officer, including specific training in narcotics and experience in implementing investigative techniques.   JA 138.4.   The affidavit also states that as a result of her law enforcement training and experience, Sergeant Grant "ha[s] become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug conspiracies."   *Id*.   Sergeant Grant also detailed her narcotics training experience, including experience in investigating violations of the Maryland Controlled Dangerous Substance Act, and her testimony in Maryland state and federal courts, "which has led to convictions."   *Id*.

Based on this training, knowledge, and experience, Sergeant Grant set forth facts about materials that drug distributors often have in their residences:

1. Users/distributors often store quantities of controlled substances in their residences or vehicles in order to conceal same from law enforcement and other external sources.

4

. . .

4. Users/distributors usually keep paraphernalia for using, packaging, cutting, weighing, storing and distributing the controlled dangerous substance.

. . .

6. Users/distributors of controlled dangerous substances often keep firearms or other weapons on them or in their residences in order to protect the controlled dangerous substances and/ or monies obtained from the sale of the controlled dangerous substances.   State and Federal Courts have taken notice that there is an indisputable nexus between the drug trade and weapons.

JA 138.5.   Sergeant Grant asserts that courts have found "an indisputable nexus between the drug trade and weapons."   *Id*.

The balance of the affidavit contains facts specific to Conley based on multiple confidential informants, controlled buys of narcotics, and surveillance. The affiant had been investigating the Riggs Park Crew, whose members operated in Washington, D.C., Prince George's County, and Howard County, Maryland. JA 138.6.   Members of the Riggs Park Crew had been "linked" to several homicides, shootings, Armed Robbery, and the Distribution of Controlled Substances. *Id*.   In January 2016, a confidential informant had identified Conley as a member of the Riggs Park Crew.   *Id*.   The same informant stated that Conley was very violent and "always carries an AK-47 assault rifle."   *Id*.   Furthermore, the confidential informant believed that Conley "was in hiding due to a recent homicide and several shootings involving members of the Riggs Park Crew."   *Id*.

According to the affidavit, in February 2016, law enforcement developed another confidential informant ("CI-2") who also identified Conley as a member of

5

the Riggs Park Crew.   *Id*.   CI-2 divulged that he had purchased crack cocaine from Conley for "several years," that Conley "always carries a weapon," and that CI-2 had observed a weapon in Conley's vehicle in the past.   *Id*.   CI-2 stated that Conley sells "distribution quantities" of crack cocaine in the Riggs Park area of Washington, D.C. and various locations in Prince George's County, Maryland. *Id*.

CI-2 made two control buys of crack cocaine, one in February 2016 and one in April 2016 (within two weeks of the presentation of the warrant).   JA 138.6-138.7.   Physical surveillance was maintained on CI-2 and Conley through the first purchase.   JA 138.6.   Upon debriefing, CI-2 stated that Conley was in possession of a large amount of crack cocaine.   *Id*.

Electronic and physical surveillance was maintained on Conley throughout the month of March 2016.   JA 138.7.   Both electronic and physical surveillance placed Conley at what was later determined to be his apartment "about ninety percent of the time."   *Id.*   Conley was confirmed to lease the apartment based on rent rolls.   *Id*.

During the month of April 2016, CI-2 conducted another controlled purchase of crack cocaine from Conley.   *Id.*   CI-2 made a controlled call to Conley requesting the purchase of crack cocaine.   *Id*.   Conley's residence in Ellicott City was under observation.   *Id*.   A "short time" after the call by CI-2, Conley left his

6

residence, entered an automobile, and then made two stops before meeting with

CI-2 to sell CI-2 crack cocaine.   *Id*.

## II.     EXECUTION OF RESIDENTIAL SEARCH WARRANT.

On April 21, 2016, law enforcement executed the search warrant at Conley's

residence.   The apartment was surveilled prior to execution and Conley was seen

entering the apartment 10 to 15 minutes before entry was made.   JA 292.   Upon

entry, law enforcement officers found Conley in the kitchen, cooking powder

cocaine into cocaine base.   JA 292-293; JA 467.   Law enforcement observed a

firearm on a kitchen countertop, within Conley's reach.   JA 776.   During a search

of Conley's person, a clear plastic baggy containing 5.8 grams of a white powdery

substance and $495 were retrieved.   JA 310-311.   During the search of the

apartment, law enforcement recovered the following items, among others:   digital

scales (JA 774; JA 777); implements used for cooking crack cocaine (JA 775);

$9,425 in United States currency (JA 781; JA 787); the firearms and ammunition

listed in Count Three of the Superseding Indictment (JA 782-83; JA 785-86); and

numerous baggies containing white substances that later were shown to be cocaine

and cocaine base.   JA 467-469; JA 790.

Also seized from the house were hockey masks that, on the first day of trial,

Conley moved to exclude from evidence because the masks would "invite the jury

to speculate about whether Mr. Conley used the masks in connection with illegal conduct that has not been charged."   ECF 181 at 1-2.

## III.   ADDITIONAL EVIDENCE AT TRIAL CONNECTS CONLEY TO THE RESIDENCE, THE GUNS, AND THE DRUGS.

At trial, recordings of conversations between Conley and others during his time at the Howard County Detention Center were played.   In one recording, Conley referred to the police coming in, taking all his money, and posing with his guns.   JA 499.   In another recording, Conley was asked—by a female voice—if he was "cooking," a street term referring to the process when powder cocaine is turned into crack cocaine.   JA 502.   In response, Conley laughed and said, "Yeah, they caught me cooking."   *Id*.

A DNA forensic examiner compared samples of DNA from firearms in the residence to a sample of DNA from Conley.   If the likelihood ratio of comparison between an evidentiary sample and the known sample exceeds 1 in 700 billion, the source of the known sample is considered to be the source of the evidentiary sample.   JA 520.   Swabs from three of the weapons seized from Conley's residence—including the firearm on the kitchen counter, the firearm in the drawer in the bedroom, and one of the rifles in the bedroom—"matched" the known sample from Conley to the degree that Conley was considered to be the source of the major DNA contributor on those items.   JA 522-23.

8

Also admitted into evidence was Conley's lease contract for his residence where the search warrant was executed.   JA 490-492.   The lease term began on February 20, 2016 and terminated on April 16, 2017.   JA 491; JA 767.   The lease was signed by Conley.   JA 492; JA 772.

## IV.    DISTRICT COURT DOES NOT PERMIT DEFENDANT'S MOTHER TO TESTIFY.

On the second and last day of the Government's presentation of evidence, Conley's counsel asked permission to call Conley's mother as a witness in the case despite the fact that her name was not provided before *voir dire*.   JA 438. Defense counsel acknowledged that Conley's mother had been in the public viewing room for jury selection but asserted that she had not been watching during the actual first day of the government's case in chief.   JA 439.   Defense counsel proffered that Conley's mother would testify that there was a threat communicated regarding Conley's life and safety "which could be a motive to possess firearms other than the government's allegation," i.e. that possession of the firearms had something to do with drug trafficking.   *Id*.   Defense counsel proffered that law enforcement had reported to Conley's mother that there was a threat to him and that she "communicated that to Mr. Conley."   JA 439.

Government counsel objected to the late identification of the witness, on the grounds that it was not clear what the witness had heard or didn't hear when the jury was selected.   JA 440.   Government also argued that there was a probability

9

that cross-examination or rebuttal of the claim could lead to an expansion of the case to look into whether there were any drug connections in the reasons for the threat.    JA 440.    Government counsel also argued that a defendant may have more than one reason to have a firearm at any given time.    Having a firearm in furtherance of a drug trafficking crime "doesn't have to be *the* reason . . . [i]t has to be *a* reason."    *Id*. (emphasis added).    Because of the expansion of the scope of the trial, the fact the witness was late announced and prejudicial to the Government's case to introduce it, the Government opposed the witness.    JA 441.

The Court noted that hearing of the witness now is "late in the game" and "causes us to lose control . . . of the way the proceeding is going."    JA 441.    The Court acknowledged that the mother of the defendant "was here during the jury selection and would not have ordinarily been, and the rule on witnesses would have excluded her from being present."    JA 441.    The Court found that to be a technical objection because it is "unlikely that any prospective juror would know Mr. Conley's mother, although it's possible."    *Id*.

The Court noted that maybe a threat communicated to Mr. Conley is relevant, but also such testimony:

> [O]pens the door to very broad cross-examination of the witness, and the
> calling of other witnesses, quite frankly, to testify that Mr. Conley may have

been involved in other drug activities involving weapons and not just in this

occasion.

JA 442.   The Court posited that "[h]e may have had guns because he was involved

on a regular basis in drug distribution" and "[t]here may be witnesses that say there

was gang violence."   *Id*.

The Court found that while the proposed witness added "one possibility,"

her testimony would "open the door to some very serious cross-examination which

can only be to the detriment of your client" and that "it expands the trial

considerably."   JA 442.   The Court was not prepared to expand the trial "at this

point."   *Id*.   Specifically, "[w]e are trying to keep our focus on the main event

here, which is what happened on that occasion."   JA 442.

In summary, the district court made the following ruling:

> So, on balance, it seems to me that it is proper to deny her as a witness
> now because it's late in the game, it's going to expand considerably the trial
> on issues that I think are, frankly, harmful to the defendant, but, in any
> event, are out there.   So I am not going to permit her to testify now, but I
> won't preclude you from arguing that there are other possible explanations
> as to why he may have had guns.   And that is my ruling.

JA 443.

Immediately thereafter, the following exchange occurred:

11

MR. BURNHAM:   Mr. Conley just wanted me to add that the threat that
was communicated were that people were going to kill him that very night,
and that is -- so it was a real threat.   That's the point of emphasis he wanted
to make.

THE COURT:   It was something that his mother told him that day?

MR. BURNHAM:   Yes.

THE COURT:   That he was going to be killed that night?

Mr. BURNHAM:   That she had heard from a detective or a police officer, I
can't remember which.

JA 444.

When asked for input, Government counsel pointed out that earlier that day,
in chambers, defense counsel had proffered that the defendant's mother had been
told about a threat on Conley's life and "that's what caused him to move to the
apartment," and that the apartment lease had been signed in February 2016.   JA
445.

The court then made the following finding:

Mr. Burnham, I stress to you you are opening the door to a lot of other
evidence about why the defendant may have been under a threat.   He may
have threatened other people.   And, frankly, in terms of the evidence that
can come in, it would be a fair question to say, Have you heard, not to prove

12

it, simply, Have you heard all these other things that he's alleged to have

done?, because that's what she did.    She heard.    And it can be rebutted that

way.    It just, as I say, gets into a different trial, and we are not going to do

that.

JA 446.

Defense counsel did not raise the issue of his mother's testimony after the

closing of the Government's case, six witnesses later.

## V.    THE DISTRICT COURT TWICE INSTRUCTS CONLEY ON HIS RIGHT TO TESTIFY.

The district court at least twice instructed Conley on the potential

consequences of testifying and the manner he which he would be allowed to

testify.

Following the denial of Conley's Rule 29 motion on the third day of trial,

defense counsel informed the district court that Conley wanted to testify.    The

district court engaged in a colloquy with Conley on this right to testify:

Number one, you will be sworn to tell the truth under penalties of

perjury, so you need to understand that if you, in fact, do lie, you could

potentially be prosecuted for perjury or it may have some effect on your

sentence, number one.

Number two, when you testify, you can't limit your testimony to just

what you want to talk about.    If you are going to talk about why you feel,

13

for example, you were threatened, you are going to open the door to the

government asking a lot about what you have done in this case.   And, again,

you are under penalties of perjury, so whatever you say, you are going to

open the door to extensive cross-examination, and you can be impeached

and you can be impeached based on your prior convictions, that they can

finally come into evidence to demonstrate that perhaps you should not be

believed in the case.

These are all very serious risks that you run, but you will not be able

to say that you stand on your Fifth Amendment rights if you start to testify

about any aspect of this trial.

JA 585-86.   After interruption, the district court continued:

You have a right under the Constitution, the Fifth Amendment, not to

testify at all, and you are entitled to have me instruct the jury that they may

not draw any inference on the fact that you chose not to testify, and the

prosecutor is prohibited from making any statement in the case about your

failure to testify.

But if you do testify, you could find yourself subject and very likely

would find yourself subject to the prosecution arguing in effect that you

have testified, that you are not telling the truth, and that you are convicted of

certain crimes and so on and so forth.   And he's going to ask you very

14

specifically, Did you deal drugs?   So that's what I am telling you the risk is,

and if, notwithstanding that, do you choose to -- let me finish my statement -

- if you, notwithstanding that, choose to testify, that is something that you

are doing.

So I am willing to accept that you have a right to testify or not to

testify as long as you understand that you are subject to impeachment and so

on.   Go ahead.

JA 587.

Conley complained that the Government did not "tell the jury nothing about

the controlled buys that they executed the warrant far (sic)" and "I am about to get

convicted without them showing the controlled buys."   JA 587.   The district court

responded: "I have told you several times in this case that with regard to the

controlled buy by someone, that's not part of where we are today.   I decided that

twice."   JA 588.   The district court instructed Conley that the issue of the

controlled buys "is not before this jury now."   JA 588-89.

The district court also instructed Conley on his comportment in the

courtroom:

If, when the jury comes back, you testify and you are out of line, if

you act disrespectfully to the Court, you assault -- if you assault the Court --

if you assail the Court in words or otherwise, if you do the same to the

prosecution, I am going to remove you from the courtroom.

This is not a license for you to ram about what's going on.   I am not

going to – listen to me again because you need to know this before I oust

you from the courtroom if it comes to that.   You are not to argue to this jury

that you don't like the fact that there was finding about a controlled buy in

connection with the warrant.

JA 590.   After further back and forth with the defendant, the district court stated

on the record that "I am satisfied that the defendant has waived his Fifth

Amendment right if he chooses to testify."   JA 592.

Defense counsel then requested that the testimony of Conley be delayed

until the next day.   JA 593.   The district court decided "[w]e will put him on first

thing in the morning, and he can think about it.   Try and talk to him some more

tonight."   JA 593.

The fourth day of trial began with the defense counsel announcing that

Conley wanted to testify and would be the only defense witness.   The district

court instructed Conley on the significance of the decision to testify:

Mr. Conley, I need to repeat for the record what I said yesterday

because this is an important decision that you are going to make.   Number

one, if you choose not to testify, and you have an absolute right not to

16

testify, you are entitled to an instruction from me to the jury that they may not consider in any way the fact that you have chosen not to testify since you are not obliged to put on any evidence at all in the case, and that's an important rule.

  If you choose to testify, just to go on, you are going to be treated like any other witness.   You may be cross-examined, you may be impeached, meaning inconsistencies or other irregularities in your past might be brought up by the government on cross-examination just as any other witness would be.   So you need to understand that you run a risk when you do testify.

  But in any event, I understand that you have talked to Mr. Burnham about that and you have told him more than once you want to testify, so I will accept that that's what you want to do, but you need to keep in mind you have to testify according to orderly procedure in the Court, so that, for example, you have to testify to things that are relevant and material.   You can't go into matters that you'd like to talk about that are not relevant.

JA 599-600.

The district court again warned Conley about the consequences of misbehavior, among other things:

  I am going to make rulings on the case.   If you speak -- if you go out of bounds, I will let you know, with fair warning, and then if it gets to a

17

point where you are not paying attention, I am going to remove you from the

courtroom, and you can follow the proceedings on closed-circuit.

JA 601.   To this, Conley responded "I am not even trying to proceed in this

courtroom."   *Id.*   Over several pages of transcript, Conley then conveyed to the

district court that he did not want to participate any further:

> I don't even give a fuck. Get me out of here.   JA 603.

> Take me back. I don't give a fuck what he do.   I don't care about –
> fuck this trial.   He railroading me.   Send me back to jail.   I don't care.   I
> am going back to jail.   *Id.*

> I am not sitting down.   I am trying to go.   You all can't force me to

sit down.   JA 605.

The district court then noted the following on the record:

It seems to me that under the circumstances, the option is going to be that he

will be acting in similar fashion once the jury is here, at which point, I am

going to have to remove him.   It may well be that it's appropriate right now

to simply have him removed from court and arrange for him to view the

television.

Are you prepared to sit here, Mr. Conley?   You need to answer.

JA 607.   Conley: "I said no."   *Id.*

After the district court again requested defense counsel talk to Conley about testifying, there was a recess.   JA 610.   When the court returned from recess two hours later, defense counsel announced that "Mr. Conley does not wish to come back to court for the remainder of the trial" and acknowledged that Conley had asked to be taken back to the detention center.   JA 611.   Instead, Conley was held in a cell in the Courthouse where he could observe and hear the proceedings in the Courtroom via closed circuit television, and the jury was so informed.   JA 615. The district court did not permit Conley's image from the cellblock to be presented on the screens in the courtroom.   JA 613-14.

## VI.   CONLEY LEAVES THE COURTROOM, BUT REQUESTS TO TESTIFY FROM THE COURTHOUSE CELLBLOCK AND IS DENIED.

When the jury was brought in, they were informed by the district court that Conley "has declined to be present; however, he does have available a closed-circuit TV observation of the court proceedings, including audio, and that is how he will participate this afternoon."   JA 615.   Furthermore, "I should mention that you should not attach any significance to the fact that Mr. Conley is not present. That will not be part of your considerations."   JA 616.   The district court then began reading the jury instructions.   *Id.*

Shortly thereafter, a few paragraphs into the jury instructions, defense counsel interrupted the district court:

19

The reason—I apologize for interrupting the Court during

instructions.   The reason I did so is [the courtroom deputy] just this minute

informed me orally that Mr. Conley had communicated by some means that

he wished to testify via video conference, and so I didn't think I could just

let that go by without mentioning something, so I brought that to the Court's

attention.

What my request would be, having put that on the record, is that we

go ahead and proceed because I regard myself as having already rested, so I

am not requesting the Court do that, but I at least wanted to communicate the

request.

JA 618.   The district court stated as follows:

All right.   Well, candidly, it's this sort of on gain/off again

behavior which is potentially complicating the trial, so I am not going to

permit him, now that we have moved to the instruction phase of the case and

I actually started my instructions, for him now to come up and testify at all,

certainly not by video.   He is not entitled to special treatment.

\* \* \*

Your request[] is noted, but that—to the extent that it's a

motion, it's denied.   JA 619.

After instruction, the jury returned a verdict of guilty on all three counts of the superseding indictment, including specific findings as to individual firearms and ammunition.   JA 729-34.   Each juror was polled and affirmed the verdict. JA 733-34.   After additional instruction and argument, the jury found for the forfeiture of the $9,495 recovered from Conley's residence as well as the firearms and ammunition.   JA 755-60.

This appeal followed.

## SUMMARY OF ARGUMENT

Both the state court judge who issued the search warrant and the district court judge who reviewed it below correctly determined that the application and affidavit on their face provided probable cause for the search of Conley's apartment.   Moreover, the officers executing the warrant were entitled to rely in good faith on the warrant as it was amply supported by probable cause.

The district court properly exercised its discretion in denying a motion, presented the morning of the second and last day of the Government's case, to have Conley's mother testify.   The proffer of her testimony conflicted with information proffered the same morning in chambers.   Moreover, the testimony would have opened the door to evidence of gang involvement, robberies, and other drug dealing—a major part of that evidence the defense had moved to exclude prior to trial and the Government was not going to present.   Because the proffered testimony, revealed late in the context of the trial, would have expanded the trial to issues unfavorable to Conley, the district court properly denied the motion within its discretion.

Conley now argues that—after making a motion after jury instructions had commenced—he should have been allowed to testify from the courthouse cellblock after he declined to remain in the courtroom after the close of the Government's case.   These arguments are not well-taken.   Nor should Conley be allowed to

raise an ineffective assistance of counsel claim on direct appeal, particularly because the record does not conclusively show any error by counsel; in fact, the record shows that counsel ably represented Conley during the trial.

## ARGUMENT

## I.    THE SEARCH WARRANT FOR CONLEY'S RESIDENCE WAS SUPPORTED BY PROBABLE CAUSE.

### A.    Standard of Review.

A district court's legal determinations on suppression with respect to the validity of a search warrant are reviewed *de novo*.   *United States v. Blakeney*, 949 F.3d 851, 859 (4th Cir. 2020).

### B.    The State Court Judge Had a Substantial Basis for Issuing the Warrant to Search Conley's Residence.

Whether probable cause for a search exists is a "practical, common-sense" question, asking whether "there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983).   Probable cause must be assessed based on the "totality of the circumstances;" it "is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules."  *Id*. at 232.   A magistrate judge's decision to issue a search warrant is reviewed with "great deference," asking only "whether the judicial officer had a 'substantial basis' for finding probable cause."

*United States v. Jones*, 942 F.3d 634, 638 (4th Cir. 2019) (*quoting Gates*, 462 U.S. at 236-38).

Here, the search warrant affidavit provides a substantial basis for the state court judge's finding of probable cause to search Conley's apartment.   The affidavit set forth the following facts, among others:   (1) two confidential informants identified Conley as a member of the Riggs Park Crew; (2) both informants said that Conley supplied crack cocaine in Washington, D.C. and Prince George's County, Maryland; (3) both informants stated that Conley "always" carries a weapon; (4) the second confidential informant stated he had purchased crack cocaine from Conley "for several years"; (5) in February 2016 and April 2016 (within two weeks of the search warrant application), the second confidential informant purchased crack cocaine from Conley under electronic and physical surveillance; (6) Conley received the call to set up the second controlled buy at his residence and left from there to travel to the transaction, albeit with intermediate stops; (7) the second controlled buy was for "a little more than" 5 grams of crack cocaine; (8) electronic and physical surveillance of Conley placed him at his residence "about ninety percent of the time."   JA138.6-138.7.   The sworn affidavit by a sergeant with more than 17 years of experience also established, based on the officer's training, knowledge, and experience, that drug distributors "often" store controlled substances in their residences, that they keep

24

paraphernalia for "packaging, cutting, weighing, storing, and distributing the controlled dangerous substance," and that they keep weapons on them or in their residences to protect the drugs "and/or monies obtained from the sale of drugs." JA 138.5.

All of this evidence amounted to (more than) a fair probability that drugs, or related paraphernalia, or guns, or money (or other specified items) related to Conley's known drug distribution business would be found in the residence where he spent about 90 percent of his time.

Conley contests the validity of the warrant asserting that there is an insufficient link between Conley's home and any alleged criminal activity, relying primarily on *United States v. Lalor*, 996 F.2d 1578 (4th Cir. 1993). The search warrant here contains additional information that distinguish it from the warrant in *Lalor*. In *United States v. Anderson*, 851 F.2d 727, 729-30 & n.1 (4th Cir. 1988), *cert. denied*, 488 U.S. 1031, 102 L. Ed. 2d 973, 109 S. Ct. 841 (1989), this court adopted the rule that "the nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep such evidence." *Id*. at 729. The court held that probable cause can be inferred from the circumstances, and a warrant is not invalid for failure to produce direct evidence that the items to be seized will be

found at a particular location.   *See id*. (reasonable to infer that pistol and silencer would be found at defendant's residence).

*Lalor* does not reflect that the officer swearing out that warrant, like Sergeant Grant here, had 17 years of experience and extensive training, and based on that training, knowledge, and experience expected drugs, paraphernalia, weapons, and money to be in the residence of a drug trafficker to, among other things, conceal, protect, and/or prepare the materials.   JA 138.5-138.6.   Whereas the Court in *Lalor* found the affidavit "devoid of any basis" for an inference that evidence of drug activity could be found at the residence, *see Lalor*, 996 F.2d at 1582, Sergeant Grant's training, knowledge, and experience was explicitly crystallized into what and why a drug trafficker would have particular materials in their residence.   JA 138.5.   Furthermore, while the warrant in *Lalor* set forth some conflicting evidence on where Lalor might actually live, *the amount of time* he spent at that residence was never really indicated.   *See Lalor*, 996 F.2d at 1580, 1582.   But here, based on electronic and physical surveillance, Conley—who had been selling drugs for "years" and "always" carried a gun—was at his residence, where he was also listed as the leaseholder, 90 percent of the time.   JA 138.6-138.7.   Given the other details provided by the warrant, including the information from the informants regarding guns as well as the two purchases of crack cocaine that corroborated the information that Conley was a distributor of crack cocaine, it

would be surprising not to find some evidence of drug crime—whether drugs, guns, paraphernalia, or money—in a residence where Conley stayed 90 percent of the time.

The search warrant was based on probable cause, was validly issued, and should be upheld by this Court. *See United States v. Williams*, 548 F.3d 311, 319 (4th Cir. 2008) (citing cases where search warrant of residence was upheld where affiant described the suspects' involvement in drug trafficking and then explained that, in the affiant's experience, drug traffickers usually store drug-related items in their homes).

## C.    The Executing Officers Relied on the Warrant in Good Faith.

Alternatively, this Court should affirm because the officers relied in good faith on the warrant under *United States v. Leon*, 468 U.S. 897, 913 (1984). Pursuant to *Leon*, so long as the evidence was seized from the residence during the execution of a facially valid warrant, the fruits of the search should not be suppressed even if the affidavit is found to lack probable cause. *See United States v. Lalor*, 996 F.2d 1578, 1582 (4th Cir. 1993) (evidence admissible under *Leon* good faith exception where warrant failed to establish a nexus to the residence searched).

In *Leon*, the Supreme Court held that the Fourth Amendment exclusionary rule does not bar the admission of evidence obtained by officers acting in

reasonable reliance on a search warrant which was issued by a detached and neutral magistrate but ultimately found to be invalid.    468 U.S. at 922.    In reaching this conclusion, the Supreme Court emphasized that the standard for assessing the officer's good faith reliance on the magistrate's probable cause determination is one of objective reasonableness.    *Id*. at 918-21.    In the absence of an allegation that the magistrate abandoned his or her detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause.    *Id*. at 923; *see also United States v. Hyppolite*, 65 F.2d 1151, 1155 (4th Cir. 1995).

Here, of course, two judges have reviewed the warrant and found that there was probable cause.    This is significant because a warrant should be upheld even when there is a disagreement between judges which would indicate an officer's reliance on the affidavit is objectively reasonable.    *Leon*, 468 U.S. at 926.    As such, this Court should affirm on good faith.

The other arguments made by Conley here are not well-taken.    For example, Conley alleges there is "nothing to infer that Mr. Conley stores drugs in his residence," but he completely ignores the facts submitted that he has been dealing drugs for years, had done so recently (and corroboratively), and stayed at the residence 90 percent of the time.    Moreover, there is also the sworn statement by

28

Sergeant Grant, based on her extensive experience, of what and why you would expect a drug trafficker to store (among other things) drugs at his residence.   And this Court in *Williams* endorsed precisely this testimony as being sufficient.   Also flatly contradicted by the record is the assertion that "there is no mention that any suspected drug activity occurred in and around [Conley's] home during their surveillance."   Br. at 12.   In fact, as detailed in the warrant, Conley arranged the second controlled buy over his phone while he was in his apartment and the apartment was being surveilled.   This is literally "doing drug business" in his home.   (Of course, using a telephone to arrange a drug sale is a federal crime in itself.)   The executing officers had no reason to second guess the state court judge's determination that the warrant was valid.

In short, the asserted legal and factual predicates for Conley's lack-of-good-faith argument fall flat.   The search warrant can and should be upheld on good faith under *Leon*.

## II.    THE DISTRICT COURT APPROPRIATELY EXERCISED DISCRETION IN NOT ALLOWING TESTIMONY FROM CONLEY'S MOTHER.

### A.    Standard of Review.

A trial court's rulings concerning the admissibility of evidence are reviewed for the abuse of discretion.   *United States v. Fulks*, 454 F.3d 410, 434 (4th Cir. 2006).

**B.      Testimony of Conley's Mother was Properly Excluded.**

The right of a defendant to present evidence is a Sixth Amendment right, but

the accused does not "have an unfettered right to offer testimony that is

incompetent, privileged, or otherwise inadmissible under the standard rules of

evidence." *Taylor v. Illinois*, 484 U.S. 400, 410 (1988).   The right is "dependent

entirely on the defendant's initiative" and "[t]he very nature of the right requires

that its effective use be preceded by deliberate planning and affirmative conduct."

*Id*.   Rules that provide for pretrial discovery of an opponent's witnesses help

prevent judgments founded on a partial or speculative presentation of the facts.

*Id*.   Discovery, like cross-examination, minimizes the risk that a judgment will be

predicated on "incomplete, misleading, or even deliberately fabricated testimony."

*Id.* at 412.   "[A] defendant's right to present a defense is not absolute: criminal

defendants do not have a right to present evidence that the district court, in its

discretion, deems irrelevant or immaterial."   *United States v. Prince-Oyibe*, 320

F.3d 494, 501 (4th Cir. 2003); *accord United States v. Valenzuela-Bernal*, 458 U.S.

858, 867 (1982) (holding that "the Sixth Amendment does not by its terms grant to

a criminal defendant the right to secure the attendance and testimony of any and all

witnesses" the defendant desires).

Here, the district court ultimately denied the request for testimony from

Conley's mother because it was immaterial to the issues in the trial ("[w]e are

30

trying to keep our focus on the main event here, which is what happened on that occasion") and expanded the trial with issues not central to the proof ("I stress to you you are opening the door to a lot of other evidence about why the defendant may have been under a threat . . . . [i]t just, as I say, gets into a different trial, and we are not going to do that"). JA 442, JA 446. Given the lateness of the disclosure of the witness and the likely expansion of issues in such a way that would not be beneficial to the defendant or material to the issues before the jury, the district court properly exercised its discretion in refusing to allow testimony by the defendant's counsel. *See Taylor*, 484 U.S. at 417-18 (holding that trial court properly rejected defense attempt during trial to call a "surprise witness" who was not previously disclosed); *United States v. Ramos-Gonzalez*, 775 F.3d 483, 496 (1st Cir. 2015) (district court properly rejected defense request on the third day of trial to call alibi witness who was not previously noticed in pretrial disclosures).

Moreover, it should be noted that Conley's counsel also moved pretrial to exclude evidence of gang affiliation from the case (ECF 51), as well as (on the first day of trial) to exclude evidence of hockey masks recovered from Conley's bedroom. JA 7, JA 19. In other words, Conley moved to exclude evidence of potential additional explanations for why he might have firearms in his apartment. The Government voluntarily avoided any mention of gangs or hockey masks in its case—there are no mention of these in the trial transcript by government

witnesses—including how the Riggs Park Crew gang activity and a string of related murders might in fact be connected to drug money and drug territories—as was at least implicit in various search warrant affidavits in the record of the case. *See* JA 138.6.

At the same time, during the pre-trial period, Conley's counsel at various times moved for the disclosure of the identity of the confidential informants mentioned in the search warrants in this case. The safety and security of those confidential informants, in view of the gang related retaliatory murders expressly mentioned in the investigation's search warrants, was a serious concern of the prosecution in argument before the district court. JA 186 ("Your Honor, he's looking to find out who these individuals are. It's patent."). Indeed, in a pretrial hearing in which Conley represented himself, the district court had directly addressed Conley's attempts to haul the confidential informants into court. JA 187 ("What you would like is to get CS-1, 2, or 3 in here and ask him a lot of questions, and the law does not permit it, for you or for anybody, except in extraordinary circumstances."). As shown in the search warrant affidavit, confidential informants had provided information on Conley's involvement in the Riggs Park Crew, and one—in January 2016—had asserted that Conley was "in hiding due to a recent homicide and several shootings involving members of the Riggs Park Crew." JA 138.6.

32

It is in this context—where evidence was limited consistent with Conley's requests—that Conley's request to have his mother testify was denied which would have worked a reversal of those earlier requests.   It would be fundamentally unfair for the defense to exclude certain evidence from the government's presentation and then reverse course through witnesses called in its own case.

Moreover, the specific facts proffered by defense counsel in chambers that morning (that Conley's mother was warned some time before Conley rented the apartment in February 2016) differed from the facts proffered in Court shortly afterward (that there was a threat communicated the very day the search warrant was executed in April 2016).   The Supreme Court in *Taylor* cautioned against allowing precisely this.   Specifically, the Court recognized a district court's inherent right to disallow testimony where it "minimizes the risk that a judgment will be predicated on incomplete, misleading, or even deliberately fabricated testimony."   *Taylor*, 484 U.S. at 411-12.   That is what the district court did here. This Court should affirm.

III.    **THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION AND DID NOT ERR IN NOT PERMITTING REMOTE TESTIMONY BY CONLEY AFTER CONLEY REFUSED TO BE IN THE COURTROOM.**

A.    **Standard of Review.**

This Court reviews a decision of the district court to proceed with a trial when the defendant is absent under an abuse of discretion standard, and the district court's factual findings will not be disturbed unless clearly erroneous.   *United States v. Camacho*, 955 F.2d 950, 953 (4th Cir. 1992).   Courts generally review *de novo* whether a defendant's right to testify on his own behalf was violated at trial. *United States v. Muslim*, 944 F.3d 154, 162 (4th Cir. 2019).   Where violation of the right to testify is not raised before the district court, the issue is reviewed for plain error.   *Id*. at 162-63.

B.    **Conley Waived His Right to Testify When He Declined to Be Present in the Courtroom.**

A defendant's opportunity to conduct his own defense by calling witnesses is incomplete if he may not present himself as a witness.   *Rock v. Arkansas*, 483 U.S. 44, 52 (1987).   But the right to present a defense through testimony is not absolute, including when a defendant is voluntarily absent from the courtroom.   A defendant may waive his constitutional right to be present at his own trial.   *United States v. Camacho*, 955, F.2d 950, 953 (4th Cir. 1992).   The continued presence of a defendant is not required when, after being initially present, the defendant waives

34

continued presence by being "voluntarily absent after the trial has begun" or when the district court warns that the defendant will be removed "for disruptive behavior, but the defendant persists in conduct that justifies removal from the courtroom." Fed. R. Crim. P. 43(c)(1)(A), (C). A defendant's voluntary absence without compelling justification constitutes a waiver of the right to be present. *Camacho*, 955 F.2d at 953.

On the morning that Conley was to testify, he was instructed on his right to testify by the district court—he had also been instructed on the right to testify the day before. JA 585-92; JA 599-600. Conley's response that morning was to leave the courtroom: "I am not even trying to proceed in this courtroom" and "I am not sitting down. I am trying to go." JA 601; JA 605. Conley further stated: "I am out of here. I am not proceeding with you." JA 607. Even after these statements, the district judge still encouraged Conley's attorney to discuss the decision to testify, but "if he does testify, he has to testify in bounds about relevant matters, and I won't permit him to go out of bounds and I will warn him that he can't do that, and if he persists in doing it, he would be removed from the courtroom even after he has begun to testify." JA 610. Recess was then taken.

Immediately after recess, Conley again waived both his right to be present and to testify when he declared, through his attorney, that he did not "wish to come back to the court for the remainder of the trial." JA 611. In fact, defense counsel

35

appropriately asked if the district court would give an instruction regarding Conley absence, which the district court then gave.   JA 615.   This included an admonition that "you should not attach any significant to the fact that Mr. Conley is not present."   JA 616.   Thereafter, when Conley sent word about testifying, he did not seek to be present in the courtroom; his request was "to testify via video conference."   JA 618.

After having been twice advised of his rights to testify by the district court, and having thereafter (noisily) left the courtroom in the particular context of his opportunity to testify in open court, and having again expressed through his attorney his unwillingness to be present in the courtroom, Conley had waived his right to testify in his own defense.   His later-than-last-minute attempt to "testify" remotely, outside the presence of the jury, was not a reassertion of his right to testify as it was contingent on remote testimony—an option not offered by the district court (and a questionable procedure on due process grounds).   As the district court stated "[h]e is not entitled to special treatment," that is, to testify and be cross-examined remotely.   JA 619.

Moreover, there had been no acknowledgment by Conley that he would comport himself appropriately in front of the jury and that he would avoid addressing testimony that was irrelevant to the questions before the jury. Reference to extraneous matters, including the validity of search warrants, had

been raised by Conley on almost every occasion he had been permitted to speak in court, albeit outside the hearing of the jury.   This is the "on again/off again behavior" that the district court referred to at trial and that had been displayed just that morning in the specific context of Conley's right to testify.   JA 619.   Because of that behavior, the district court did state that he would not bring Conley back up to testify, but there is nothing in the record to suggest that Conley would have come back to courtroom—he certainly did not ask to go back to the courtroom; in fact he had declared just the opposite.

The district court here repeatedly informed Conley of his right to testify, and, nonetheless, Conley left the courtroom and remained absent.   On these facts, the district court acted well within its discretion.   The record makes clear that the defendant voluntarily absented himself from trial based on his actions under Fed. R. Crim. P. 43.   It was thus appropriate for the court to continue with the trial without the defendant's testimony.   Fed. R. Crim. P. 43(c)(2) (providing that "[i]f the defendant waives the right to be present, the trial may proceed to completion . . . during the defendant's absence"); *see Muslim*, 944 F.3d at 161 (the district court did not abuse discretion in proceeding with trial after repeated efforts to ascertain the defendant's status and ensure the defendant's presence).

Furthermore, while Conley argues that the district court should have paused jury instructions to yet again have a colloquy with Conley when, in fact, Conley

was not present to conduct a colloquy and had not asserted a right to testify in open

court, he is wrong.   There is no right to re-open the case and allow defense

testimony once the jury is being instructed.   *See United States v. Campbell*, 480

Fed. App'x. 610, 615 (2d Cir. 2012) (district court properly exercised discretion to

deny defendant's request to testify which was made during government's rebuttal

closing argument); *United States v. Byrd*, 403 F.3d 1278, 1283 (11th Cir. 2005)

(same and citing other cases).   Moreover, there is zero basis to believe Conley

would have complied with the requirements to conduct himself properly during the

proceedings if he had been allowed to testify.   Conley had previously—that same

day—told the district court he would not participate further (understanding that the

very next activity at trial was his testimony) and made that fact so clear that his

attorney requested and the district court gave an instruction regarding Conley's

absence.

In sum, Conley waived his right to be present for the trial and his right to

testify.   The Court did not abuse its discretion in continuing with jury instruction

in his absence.

### C.    There Was No Plain Error in the District Court's Decision Not to Allow Defendant to Testify Remotely from Lockup.

This Court should also reject Conley's claim about the district court's denial

of his request to testify remotely, a request which came after the parties had rested

and while the judge was instructing the jury.   Because no objection was made, this

claim is reviewed for plain error.   To show plain error, Conley must show "(1) that the court erred, (2) that the error is clear and obvious, and (3) that the error affected his substantial rights, meaning that it 'affected the outcome of the district court proceedings.'"   *United States v. Catone*, 769 F.3d 866, 871 (4th Cir. 2014) (*quoting United States v. Olano*, 507 U.S. 725, 734 (1993)).   Even if Defendant shows plain error, this Court "retain[s] discretion whether to recognize the error and will deny relief unless the district court's error 'seriously affects the fairness, integrity or public reputation of judicial proceedings.'"   *Id*. (*quoting Olano*, 507 U.S. at 736).

There is no absolute right to be able to testify remotely and deny the jury and the government an opportunity to observe the demeanor of the witness.   *Cf. Maryland v. Craig,* 497 U.S. 836, 856-57 (1990) (discussing balancing test required under Confrontation Clause before child witness could be allowed to testify remotely).   Nor is a defendant's right to testify in his own defense absolute; the Supreme Court has recognized that any right to testify must "accommodate other legitimate interests in the criminal trial process."   *Rock*, 483 U.S. at 56.   A defendant simply cannot dictate the precise parameters under which he desires to testify.   Finally, as detailed above, when the request to testify is made after the close of evidence, it is well within the court's discretion to deny any request to re-open proceedings.   *See Campbell*, 480 Fed. App'x. at 615; *Byrd*, 403 F.3d at 1283.

Here, the district court was well within its discretion to reject Conley's offer to testify from lockup.   Conley points to no case which would have permitted such a procedure.   Nor would due process and the due administration of justice been served by entertaining such a procedure.   And even if the decision was error, it was not a clear and obvious one.   The district court has the authority to make decisions regarding the method used to present testimony to the jury—including the testimony of a defendant.   For example, a district court's authority over trial management includes whether to allow a defendant to testify in the form of a free narrative or response to specific questions.   *See United States v. Beckton*, 740 F.3d 303, 307 (4th Cir. 2014).   Just as a defendant "'does not have a constitutional right to choreograph special appearances by counsel,'" a defendant does not make all the choices with respect to the choreography of his right to testify.   *See Beckton*, 740 F.3d at 307 (*quoting McKaskle v. Wiggins*, 465 U.S. 168, 183 (1984)).   Indeed, one could imagine that had the district court permitted remote testimony from a lockup cell, Conley might have raised a due process objection to the procedure on appeal.

There is also no indication that the decision not to permit Conley to testify from lockup affected the outcome of the district court proceedings.   There was no proffer of potential testimony.   Every previous discussion of testimony with Conley turned toward the controlled buys and confidential informants described in

the search warrants, and those topics were specifically declared "out of bounds" for his trial testimony.   There is simply no basis to believe Conley's testimony would have been favorable to his defense.

Moreover, the evidence of Conley's guilt was overwhelming.   He was encountered in the kitchen of his apartment (he was the sole resident on the lease) while by his own admission "cooking" crack, with a loaded .45 caliber semiautomatic pistol next to him on the kitchen counter, and more than five grams of crack cocaine plus $495 on his person.   There were more than 100 additional grams of cocaine and cocaine base in the kitchen as well as the implements to convert cocaine into cocaine base.   There were three more semi-automatic weapons and $9000 in a shoe box in his bedroom.   Expert evidence admitted at trial established that the amounts of money recovered were consistent with distribution of drugs in the amounts recovered from the residence.

The district court did not plainly err in refusing to allow Conley to testify in the manner he wished, especially given the late hour of his request after the jury was being instructed.

## IV.   CONLEY'S COUNSEL PERFORMED IN AN OBJECTIVELY REASONABLE MANNER AND CONLEY WAS NOT PREJUDICED BY HIS COUNSEL'S PERFORMANCE.

### A.    Standard of Review.

An ineffective assistance claim made on direct appeal is reviewed *de novo*. *United States v. Freeman*, 24 F.4th 320, 326 (4th Cir. 2022). It is well-established that "[c]laims of ineffective assistance of counsel will only be considered on direct appeal when the record *conclusively* shows that counsel was ineffective." *United States v. Rose*, 3 F.4th 722, 730 (4th Cir. 2021) (emphasis added) (citing *United States v. Benton*, 523 F.3d 424, 435 (4th Cir. 2008)); *see also United States v. King*, 119 F.3d 290, 295 (4th Cir. 1997) (explaining that "it is well settled that "a claim of ineffective assistance should be raised in a 28 U.S.C. § 2255 motion in the district court rather than on direct appeal, unless the record conclusively shows ineffective assistance").

Because that bar is so high, this Court "routinely decline[s] to address on direct appeal a criminal defendant's contention that counsel has performed in an ineffective manner." *United States v. Brown*, 757 F.3d 183, 191 (4th Cir. 2014). Indeed, "[o]nly in the most unusual case will the record satisfy this requirement." *Rose*, 3 F.4d at 730; *see also United States v. Wilson*, 240 F. App'x 139, 143 (7th Cir. 2007) (noting that "only the rarest and most patently egregious of ineffective assistance claims are appropriately brough on direct appeal")). As explained below, the record in this case does not conclusively show ineffective assistance of the defendant's trial counsel.

42

**B.    The Trial Record Does Not Support Conley's Claim of Ineffective Assistance of Counsel that is Built on Counterfactual Hypothesis.**

To establish an ineffective assistance of counsel claim, a defendant must show (1) that counsel's performance was not objectively reasonable and (2) that counsel's deficient performance prejudiced him.    *United States v. Carthorne*, 878 F.3d 458, 465 (4th Cir. 2017) (*citing Strickland v. Washington*, 466 U.S. 668, 687-88 (1984)).    There is a strong presumption that counsel's conduct was within the wide range of professional assistance.    *Strickland*, 466 U.S. at 689.    Furthermore, "[t]he defendant bears the burden of proving *Strickland* prejudice," and that unless the defendant meets this burden, "a reviewing court need not consider the performance prong."    *Fields v. Atty. Gen'l of Md.*, 956 F.2d 1290, 1297 (4th Cir. 1992).    This Court will only reverse if it "*conclusively appears in the trial record itself* that the defendant was not provided . . . effective representation."    *Freeman*, 24 F.4th at 326 (internal quotations omitted).

The trial record here does not demonstrate ineffective representation, much less "conclusively" so.    The trial record shows that Conley was fully advised on his right to testify, and thereafter explicitly requested to be removed from the courtroom.    The trial record shows that Conley's counsel conveyed the message that his client did not want to testify.    The trial record shows that Conley's counsel ensured that the jury was instructed not to consider the fact that Conley was not present in the courtroom and then, when alerted by courtroom deputy clerk,

brought Conley's request to appear from the courthouse lockup to the district court's attention—even interrupting instruction of the jury to do so.   There was no reason to move to reopen the case for a client who did not indicate a desire to be present in the courtroom.   On the facts as they actually existed in the courtroom, Conley's counsel's performance was objectively reasonable, and it certainly did not prejudice the realities of Conley's case, particularly given the overwhelming evidence of guilt.

Conley's argument regarding ineffective assistance is based on pure conjecture about how Conley would have comported himself; conjecture divorced from the stark reality of Conley's courtroom demeanor and assertions.   Conley's appellate counsel hypothesizes that had defense counsel moved to reopen the case, Conley would have become compliant to the directions of the district court—when there is no basis for making that assertion.   Appellate counsel does not even argue that Conley would have returned to the courtroom to testify.   Conley was never told that he could testify from the cellblock, in fact, he was told, from the beginning of trial: "[t]he alternative is *if you would rather not appear at all*, you can observe the proceedings on closed-circuit TV, which I provided as well."   JA 265 (emphasis added).   Moreover, if Conley had returned to the courtroom, there is not a single instance in the trial record where Conley acknowledged and indicated he would comply with the district court's repeated instruction that he

would be required to limit his testimony.   Indeed, the afternoon before he was due to testify, and the morning that he declined to remain in the courtroom, Conley challenged the district court's direction to limit his testimony.   What the trial record shows is a consistent pattern of Conley's unwillingness to comport himself to the reasonable requirements set forth by the district court, and the uselessness of reopening a case that Conley would not appear to participate in.   The record fails to show any error by counsel, much less conclusively so.   *Freeman*, 24 F.4th at 326 (ineffective assistance must conclusively appear in the record).

Even assuming away all these facts, if Conley had returned to the courtroom, and had narrowed his testimony as directed by the district court, he would have been cross-examined on his criminal record, the fact of his drug distribution business, his jail call admissions, and all the drug paraphernalia, weaponry, and ammunition found in his house.   Given those damning facts, Conley can hardly show any prejudice here.   The evidence of his guilt was overwhelming, and subjecting himself to cross-examination would have only been even more fatal. Conley has utterly failed to show either prong of *Strickland* here.   This Court should affirm.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court on each of the issues raised by Conley.

Respectfully submitted,

Erek L. Barron
United States Attorney

By:   /s/ Joseph R. Baldwin
Joseph R. Baldwin
Assistant United States Attorney

June 21, 2020

## STATEMENT WITH RESPECT TO ORAL ARGUMENT

The United States respectfully suggests that oral argument is not necessary in this case.   The legal issues are not novel, and oral argument likely would not aid the Court in reaching its decision.

## CERTIFICATE OF COMPLIANCE

1.     This brief has been prepared using:

**Microsoft Word, Times New Roman, 14 Point**

2.     EXCLUSIVE of the table of contents; table of authorities; statement with

respect to oral argument; and the certificate of service, the brief contains

10,230 words.

I understand that a material misrepresentation can result in the Court's

striking the brief and imposing sanctions.    If the Court so directs, I will provide an

electronic version of the brief and/or a copy of the word or line print-out.


/s/ Joseph R. Baldwin
Joseph R. Baldwin
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on June 21, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Alfred Guillame, Esq.
1350 Connecticut Ave., NW
Suite 308
Washington, D.C. 20036
ag3law@gmail.com

/s/ Joseph R. Baldwin
Joseph R. Baldwin
Assistant United States Attorney